**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ARTHUR JOHNSON,** | : | **CIVIL ACTION NO. 1:16-CV-863** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN WETZEL, Secretary of** | : | |
| **the Pennsylvania Department of** | : | |
| **Corrections,** *et al.,* | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Arthur Johnson ("Johnson" or "Mr. Johnson") is a convicted murderer.  He has been in the custody of the Pennsylvania Department of Corrections ("the Department") since 1973, serving a life sentence without the possibility of parole.  For the past thirty-six years, the Department has held Mr. Johnson in solitary confinement—his entire existence restricted, for at least twenty-three hours per day, to an area smaller than the average horse stall.  Astoundingly, Mr. Johnson continues to endure this compounding punishment, despite the complete absence of major disciplinary infractions for more than a quarter century.

Mr. Johnson initiated this cause to challenge his institutional exile as violative of the United States Constitution.  Presently, Mr. Johnson moves the court to compel the Department to: (1) stop his interminable isolation and (2) release him to general population.

## I.   **Background**

On May 12, 2016, Johnson commenced this matter with the filing of a three-count complaint, contemporaneous with a motion for preliminary injunction.  (See Docs. 1, 3).  Johnson challenges the constitutionality of his continued placement in solitary confinement pursuant to 42 U.S.C. § 1983.  He asserts claims for violation of the Eighth Amendment's proscription against cruel and unusual punishment (Count I) as well as the Fifth and Fourteenth Amendments' respective guarantees of substantive and procedural due process (Counts II and III).  Johnson names as defendants John Wetzel, Secretary of the Department; Shirley Moore-Smeal, Executive Deputy Secretary of the Department; and Michael Wenerowicz, Regional Deputy Secretary of the Department; as well as Brenda Tritt, Superintendent of the State Correctional Institution ("SCI") in Frackville, Pennsylvania; James Meintel, Deputy Superintendent for Facilities Management at SCI Frackville; and Anthony Kovalchik, Deputy Superintendent for Centralized Services at SCI Frackville. (Doc. 1 ¶¶ 7-12).  Johnson seeks a declaration that the defendants' conduct violates the United States Constitution, and he requests compensatory and punitive damages as well as permanent injunctive relief.  (Id. at 24-25).

In the instant motion, Johnson petitions the court to compel his reintegration to general prison population.  (Doc. 1-1).  He also seeks psychological counseling to redress the deleterious psychological effects of his long-term isolation.  (Id.)  The court convened a preliminary injunction hearing over the course of two separate days, taking Johnson's evidence on July 6, 2016, and defendants' evidence on August 11, 2016.  Per the court's directive, the parties filed proposed findings of fact

and conclusions of law (Docs. 65-66) on September 7, 2016.  Johnson's motion (Doc.

3) for preliminary injunction is now ripe for disposition.

## II.    Findings of Fact[1]

The predicate facts undergirding the instant dispute are largely uncontested.

Johnson is serving a life sentence without possibility of parole for a homicide that

occurred during a street fight in October 1970.  See Commonwealth v. Johnson, No.

CP-51-CR-110791-1971 (Pa. Ct. Com. Pl. Phila. Cty.); (Joint Stip. ¶ 2).  Johnson has

been in the Department's custody continuously since his conviction in August of

1973.  (See Joint Stip. ¶ 1; Doc. 65 ¶ 1; Doc. 66 ¶ 1).

### A.    Johnson's History in Department Custody

According to Department records, Johnson was involved in a violent escape

attempt at SCI Pittsburgh on December 22, 1979.  (Joint Stip. ¶ 6).  A corrections

officer was bound, gagged, and locked in a prison cell during that attempt.  (See id.)

Records indicate that Johnson was in possession of two loaded zip guns at the time

of his unsuccessful escape attempt.  (Id.)  Prison administrators subsequently

removed Johnson from general population and placed him in a restricted housing

unit ("RHU"), commonly referred to as "solitary confinement."  (Id.; see Doc. 65

---

[1] Consistent with the directive of Federal Rule of Civil Procedure 65(d), the following factual narrative represents the court's findings of fact as derived from the record.  To the extent the parties' proposed findings of fact (Docs. 65-66) find support in the record evidence, the court cites directly thereto.  Citations to the record also include the transcript of the preliminary injunction hearing convened on July 6, 2016 ("Tr. 1"), sealed and unsealed transcripts of the hearing convened on August 11, 2016 ("Tr. 2" and "Tr. 3," respectively), Johnson's hearing exhibits ("Ex. P-_"), defendants' hearing exhibits ("Ex. D-_"), and the parties' joint stipulation of facts ("Joint Stip. ¶ _").

¶ 2).  Department records reflect that Johnson was accused of two additional

escape attempts in 1984 and 1987.  (Joint Stip. ¶¶ 7, 9).  Johnson accrued "at least

ninety class 1 misconducts" during the early years of his incarceration for escape,

attempted escape, possession of contraband, and assaultive behavior.  (Doc. 66 ¶ 9).

Since 1987, Johnson has not been disciplined for any serious misconduct.  (Joint

Stip. ¶ 8; Doc. 65 ¶ 71).  With the exception of a "very minor" infraction involving a

multivitamin deemed "contraband," Johnson has been misconduct free for more

than a decade.  (Doc. 65 ¶ 72).  Deputy Superintendent Meintel describes Johnson

as "the model inmate."  (Id. ¶ 74).  Notwithstanding this decade of exemplary

behavior, Johnson remains in isolation.  (Doc. 66 ¶¶ 99-100).

### B.    The Restricted Release List

In approximately 2004, the Department instituted a Restricted Release List

("RRL") program designating certain categories of inmates to solitary confinement

indefinitely.  (See Joint Stip. ¶ 20).  An inmate placed on the RRL is "held in the

RHU unless and until they are taken off RRL status."  (Id.)  Only Secretary Wetzel

is authorized to remove a prisoner from the RRL.  (Id. ¶¶ 21, 30).  The Department

placed Johnson on the RRL in 2009, and he remains on the RRL to present day.

(See id. ¶¶ 22, 32).

The Department amended its policy in October 2012 to mandate annual

review of RRL designations by the Secretary.  (Id. ¶ 23).  The annual review process

commences with circulation of a form referred to as a "DC-46 vote sheet."  (Id. ¶ 24).

Therein, select staff members and prison officials opine as to whether a particular

prisoner should remain on the RRL.  (Id.)  The vote sheet is then forwarded to the

Department's Central Office, where both the Regional Deputy Secretary and Executive Deputy Secretary provide additional input concerning the prisoner's continued RRL status.  (Id. ¶ 25).  As part of the review process, a Department psychological services specialist ("PSS") conducts psychological evaluations of RRL inmates.  (See Doc. 66 ¶ 85).  The PSS provides input on circulated vote sheets based on their observations.  (See id. ¶ 84).  According to Secretary Wetzel, the term "vote sheet" is something of a misnomer, because only the Secretary is authorized to make final RRL decisions.  (Id. ¶ 82).

Inmates have an "opportunity to speak about" the RRL designation before a Program Review Committee (the "Review Committee") approximately every ninety days, (Joint Stip. ¶¶ 25-26), but the extent of that opportunity is not fully apparent from the record.  The Review Committee "has no authority to release an inmate" from the RRL, but it may make a recommendation to a prison's facility manager "if it is believed that an inmate on the RRL could be safely released to general population or to a Specialized Housing Unit."  (Id. ¶¶ 27-28).

The Department has reviewed Johnson's RRL designation annually since 2013, but Secretary Wetzel has not authorized Johnson's removal from the RRL.  (See Joint Stip. ¶¶ 31-32).  Johnson's annual psychological reviews for 2012 and 2013 identify "attempted escapes and staff assaults" as the basis for recommending Johnson's continued isolation.  (Doc. 65 ¶ 49; see also Ex. P-11 at 3; Ex. P-12 at 3).  The most recent review, which occurred in 2015, was fully explored by the parties during the preliminary injunction hearing.

The 2015 RRL review process began with circulation of a DC-46 vote sheet in August of 2015.  (Doc. 65 ¶ 51; <u>see</u> Doc. 66 ¶¶ 80-84).  The Superintendent and both Deputy Superintendents at SCI Frackville voted to remove Johnson from the RRL. (Doc. 65 ¶ 51; Ex. P-17).  On August 24, 2015, Johnson's then-assigned PSS, Siena Smith ("PSS Smith"), voted to retain him on the RRL based on his escape history and "threats to harm others."  (Ex. P-17).  PSS Smith had just begun working with Johnson in March 2015, had not developed a communicative relationship with him at the time, and now concedes that her vote was based entirely on his decades-old escape attempts.  (Doc. 65 ¶ 61).

On October 2, 2015, at Secretary Wetzel's request, PSS Smith conducted a psychological evaluation to supplement Johnson's RRL review.  (Doc. 66 ¶ 89; <u>see also</u> Doc. 65 ¶ 62).  PSS Smith observes in an accompanying report that, during the review, Johnson stated: "I have too much respect for you to lie and give you the answers I know they want to hear.  I would prefer that someone else ask me the questions."  (Ex. P-16 at 3).  PSS Smith reports that Johnson made this comment while the "PSS was. . . asking [Johnson] about his escape attempts and assaults and his plans for doing them in the future."  (<u>Id.</u>)  At the preliminary injunction hearing,

however, PSS Smith testified that Johnson offered this remark in response to a

question about prospective escape plans only.[2]  (Tr. 2 at 39:17-24, 81:3-22).

Secretary Wetzel ultimately decided to retain Johnson on the RRL

following the 2015 review, based in large part on PSS Smith's psychological

evaluation.  (Doc. 65 ¶ 54; Doc. 66 ¶¶ 98-100).  In response to the undersigned's

inquiry, Secretary Wetzel conceded that "short of eliminating his history and

retracting his statements" as construed by PSS Smith, there is no hope for

Johnson's removal from the RRL.  (Doc. 65 ¶ 69).

### C.   Johnson's Mental Health

During the July 6, 2016 injunction hearing, Johnson testified at length to the

effects of his prolonged isolation.  He explained that he suffers from sleeplessness,

anxiety, depression, obsessive behavior, anger, loss of concentration, loss of short-

term memory, and despair.  (Doc. 65 ¶¶ 33-35).  He also described feeling hopeless,

stating: "I behave every way that they told me I [was] supposed to behave, and it

---

[2] At defendants' request, the court ordered that PSS Smith's testimony be filed under seal.  Thereafter, Johnson moved to unseal the testimony, citing the "strong presumption of openness" of judicial proceedings, Miller v. Ind. Hosp., 16 F.3d 549, 559 (3d Cir. 1994), and observing that the sensitive documents central to PSS Smith's testimony were later unsealed by the court.  (Doc. 61).  Johnson's counsel notes that the Department transferred Johnson to SCI Coal Township immediately following the August 11, 2016 hearing, eliminating any ostensible threat to PSS Smith's personal security.  (Id. at 7-8).  The court deferred resolution of Johnson's motion to unseal and directed the parties to set forth their respective positions in proposed findings of fact and conclusions of law.  (Doc. 62).  Defendants fail to substantively challenge Johnson's motion to unseal in their proposed findings, (see Doc. 66 at 7-8 n.4), and the court deems any objection to Johnson's motion to be waived.  Moreover, the court finds that any institutional security concerns stemming from unsealing PSS Smith's testimony have been abated by Johnson's transfer.  The court will therefore grant Johnson's motion (Doc. 60) to unseal PSS Smith's testimony.

really doesn't mean nothing at all," referring to defendants' refusal to release him from isolation.  (Id.)  Johnson explained that, historically, he has been hesitant to report his mental suffering to prison psychological staff because he "was brought up not to 'complain.'"  (Id. ¶ 37).

Craig Haney, Ph.D. ("Dr. Haney"), is a psychologist who studies the intersection of psychology and the law, with particular emphasis on the effects of long-term solitary confinement.  (Tr. 1 at 85:7-18).  Dr. Haney evaluated Johnson in a non-contact visitation room at SCI Frackville on January 26, 2016, and submitted a comprehensive expert report of his findings.  (See Doc. 4-2 ¶ 14 ("Haney Report")).  Therein, Dr. Haney documents Johnson's reports of progressive sleeplessness, frenetic ruminations, difficulty concentrating and focusing, obsessive behavior, and increasing irritability.  (Id. ¶¶ 149-50).  He notes that Johnson described "struggl[ing] greatly with depression."  (Id. ¶ 150).  Dr. Haney opines that it is only Johnson's "exceptional resilience" that has allowed him to endure his lengthy isolation, but that the experience "has finally worn him down psychologically." (Id. ¶ 146).  Based upon his in-person assessment of Mr. Johnson, Dr. Haney testified that "[Johnson] has struggled to maintain his sanity" in isolation, and has deteriorated to the point of experiencing "social death"—the condition of having so few meaningful social contacts, and such an acute awareness of that deficit, that an individual loses the ability "to function as a social being."  (Tr. 1 at 115:20-25; see also Haney Report ¶¶ 21, 145).  Dr. Haney concludes that Johnson is "approaching losing the will to live," and that, without a change of circumstance, he would

"expect [Johnson] to enter that last or final stage of giving up, or basically not being able to tolerate this existence any longer." (Doc. 65 ¶ 39).

In sharp contrast, PSS Smith flatly rejects the proposition that Johnson is experiencing any form of mental health disorder. (See Doc. 66 ¶ 42). PSS Smith began treating Johnson in March 2015 and conducted cell-side "contact visits" with Johnson two or three days per week. (Doc. 65 ¶ 56; Doc. 66 ¶ 48). During these contact visits, PSS Smith neither enters the inmate's cell nor removes the inmate therefrom; instead, she speaks to inmates through solid steel isolation doors for brief periods, ranging between five and fifteen minutes. (Doc. 65 ¶ 29; Doc. 66 ¶¶ 41, 50). The vast majority of PSS Smith's contact notes include only a cursory statement that "inmate reports no issues/concerns," with no meaningful observations. (See Ex. P-15). Nonetheless, a number of contact notes reflect that Johnson reported suffering anger, frustration, depression, insomnia, and loss of focus. (Doc. 65 ¶ 30; see also Ex. P-15 at 55, 60, 64, 66, 69, 97, 101, 102, 115). On a few occasions, PSS Smith indicated that she "reviewed coping skills" with Johnson in response to his complaints. (Ex. P-15 at 69, 97, 101, 115, 116). Despite these documented issues, PSS Smith does not believe Johnson exhibits symptoms of mental illness or decompensation. (Doc. 66 ¶¶ 42-45).

Pogos Voskanian, M.D. ("Dr. Voskanian"), a board-certified forensic psychiatrist, evaluated Johnson and submitted an expert report at defendants' request. (See Tr. 3 at 46:4-7; Ex. D-10 ("Voskanian Report")). During their meeting on July 22, 2016, Johnson reported suffering from insomnia, anxiety, depression, loss of concentration, and hopelessness. (See Doc. 65 ¶ 34; Tr. 3 at 72:13-73:13; see

9

<u>also</u> Voskanian Report at 7-8).  Dr. Voskanian agreed on cross-examination that

Johnson's self-reported symptoms are constituent elements of depressive disorder,

but opined that his symptoms do not yet present with sufficient frequency to "add

up to a diagnosable condition."  (Tr. 3 at 72:2-9, 76:14-77:17).  Consequently, Dr.

Voskanian testified that Johnson is not presently suffering from any cognizable

form of mental illness.  (<u>See</u> <u>id.</u>; <u>see</u> <u>also</u> Doc. 66 ¶ 42).

### D.   Conditions of Johnson's Confinement[3]

Johnson's cell in the RHU is approximately seven feet wide by ten feet long,

comprising a total area of sixty-eight square feet, of which forty-seven square feet

are unencumbered.  (Joint Stip. ¶ 12; Doc. 65 ¶ 6; Doc. 66 ¶ 11).  Johnson has a

television, radio, bed, mattress, desk, and toilet, and his cell contains a small

window with a view of the exercise yard.  (<u>See</u> Doc. 65 ¶ 6; Doc. 66 ¶¶ 13-14).  Two

narrow windows in the cell's solid steel door permit an obstructed view of general

population.  (<u>See</u> Doc. 65 ¶ 6; Ex. P-1 at 1).  The cell is illuminated by a security light

twenty-four hours per day.  (Doc. 65 ¶ 6; Doc. 66 ¶ 16).  Johnson eats, sleeps, washes

up, and uses the toilet all within this sixty-eight square foot space.  (Doc. 66 ¶¶ 17-18;

Tr. 1 at 174:22-175:4).  Johnson can only speak to other inmates by yelling through

his cell's solid steel door.  (Doc. 65 ¶ 8; Doc. 66 ¶ 22).

---

[3] Johnson's counsel reports that the Department transferred Johnson from
SCI Frackville to SCI Coal Township following the August 11, 2016 hearing.  (Doc.
61 at 7-8).  Record evidence as to the conditions of Johnson's confinement pertains
to his cell in the RHU at SCI Frackville.  Although the court's factual summary and
analysis address the conditions at SCI Frackville, the court logically assumes that
Johnson remains subject to nearly identical conditions at SCI Coal Township.
Indeed, the Department has expressed its intent to retain Johnson on the RRL
indefinitely.  (Tr. 3 at 158:1-7).

Johnson leaves his cell three times per week for a shower.  (Doc. 65 ¶ 7; Doc. 66 ¶ 19).  Weather permitting, Johnson is allowed one hour of outdoor "yard" time each weekday.  (Doc. 65 ¶ 9; see also Doc. 66 ¶ 23).  During yard, Johnson is placed by himself in a nine-foot by twenty-foot recreation cage.  (Doc. 65 ¶ 9; Doc. 66 ¶ 24).  On weekends and days when inclement weather disrupts yard privileges, Johnson spends twenty-four hours in his cell.  (Doc. 65 ¶ 10).  All of his immediate family members are deceased.  (Id. ¶ 13).  Johnson has not had any physical contact with family or friends in more than thirty-six years.  (Id. ¶ 12).

III.   **Legal Standard**

Preliminary injunctive relief is an extraordinary remedy and should issue in only limited circumstances.  See AT&T v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1426-27 (3d Cir. 1994); see also FED. R. CIV. P. 65.  Four factors inform a district court's decision to issue a preliminary injunction: (1) whether the movant has shown "a reasonable probability" of success on the merits; (2) whether the movant will suffer "irreparable" harm if denied relief; (3) whether the requested relief will cause greater harm to the nonmovant; and (4) whether an injunction is in the public's interest.  Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff, 669 F.3d 359, 366 (3d Cir. 2012) (quoting Crissman v. Dover Downs Entm't Inc., 239 F.3d 357, 364 (3d Cir. 2001)).  The moving party bears the burden of establishing that the balance of these factors weighs in its favor.  Ferring Pharm., Inc. v. Watson Pharm., Inc., 765 F.3d 205, 210 (3d Cir. 2014).  A movant's failure to demonstrate a likelihood of success on the merits or irreparable harm in the absence of injunctive

relief renders a preliminary injunction inappropriate.  See Grill v. Aversa, 908 F.

Supp. 2d 573, 591 (M.D. Pa. 2012).

## IV.    Discussion

Johnson grounds his request for preliminary injunctive relief in his

cruel and unusual punishment claim.  (See Doc. 4 at 2 n.1).  He contends that his

indefinite and unjustified placement in solitary confinement violates the most basic

constitutional guarantees of humane treatment.  (Id. at 5-18).  A district court need

only determine that the moving party would likely succeed on one claim to issue

injunctive relief.  See Trefelner ex rel. Trefelner v. Burrell Sch. Dist., 655 F. Supp.

2d 581, 590 (W.D. Pa. 2009); First Health Grp. Corp. v. Nat'l Prescription Adm'rs,

Inc., 155 F. Supp. 2d 194, 234 (M.D. Pa. 2001).  Consequently, the court restricts its

analysis to Johnson's Eighth Amendment cause of action.

### A.    Reasonable Probability of Success on the Merits

To establish a reasonable probability of success on the merits, a movant must

produce sufficient evidence to satisfy the essential elements of the underlying cause

of action.  Punnett v. Carter, 621 F.2d 578, 582-83 (3d Cir. 1980).  The district court

must examine the legal principles controlling the claim and the potential defenses

available to the opposing party.  See BP Chems. Ltd. v. Formosa Chem. & Fibre

Corp., 229 F.3d 254, 264 (3d Cir. 2000).  A mere possibility that the claim might be

defeated does not preclude a finding of probable success if the evidence clearly

satisfies the essential prerequisites of the cause of action.  Highmark, Inc. v. UPMC

Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001).

The fundamental principles of Johnson's constitutional claim are firmly established.  The Eighth Amendment to the United States Constitution proscribes the government from inflicting upon its citizens "cruel and unusual punishment" of any form.  U.S. CONST. amend VIII.  More than two decades ago, in <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994), the United States Supreme Court observed that this constitutional proscription requires prison officials to provide "humane conditions of confinement" to their charges.  <u>Id.</u> at 832.  Prison officials violate this guarantee when they "deprive inmates of the minimal civilized measure of life's necessities." <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981); <u>Atkinson v. Taylor</u>, 316 F.3d 257, 272 (3d Cir. 2003).

An Eighth Amendment conditions of confinement claim requires both objective and subjective proof.  A prisoner must demonstrate: *first*, that he or she has been subjected to an objectively "serious" deprivation of life's basic needs or a "substantial risk of serious harm" to his or her health; and, *second*, that defendants knew of and were deliberately indifferent to that deprivation or risk.  <u>Farmer</u>, 511 U.S. at 834; <u>Chavarriaga v. N.J. Dep't of Corr.</u>, 806 F.3d 210, 227-28 (3d Cir. 2015). The court will address the requisite elements of Johnson's claim *seriatim*.

### 1. *"Serious" Conditions of Confinement*

Defendants argue that "courts have consistently upheld the [Department's] RHU regime against Eighth Amendment challenges."  (Doc. 33 at 9-10).  But Johnson's claim is not a generic challenge to the institutional use of solitary confinement.  (Doc. 34 at 2-3).  Instead, he maintains that the extraordinary duration of his confinement combines with the harsh consequences of involuntary

isolation to impel its effects across constitutional boundaries.  (See id. at 3-6; Doc. 4 at 8-13).  He contends that his prolonged confinement in the RHU denies him social interaction, environmental stimuli, sleep, and exercise, culminating in a collective deprivation of constitutional proportion.  (See Doc. 4 at 7-13; Doc. 65 ¶ 93).  The court agrees.

The objective component of a conditions of confinement claim tasks a plaintiff to demonstrate that the conditions of confinement are so "objectively, sufficiently serious" as to constitute a "denial of the minimal civilized measure of life's necessities."  Farmer, 511 U.S. at 834.  Plaintiffs may satisfy this requirement by showing either that prison officials have deprived them of "a single, identifiable human need," such as food, water, shelter, clothing, or exercise, Wilson v. Seiter, 501 U.S. 294, 304 (1991), or that prison conditions "pose an unreasonable risk of serious damage" to the prisoner's current or future health, Helling v. McKinney, 509 U.S. 25, 35 (1993).  Moreover, the fact that one or more conditions would not independently constitute an Eighth Amendment violation is not dispositive when the conditions, in combination, have a "mutually enforcing effect" of producing an unconstitutional deprivation.  Wilson, 501 U.S. at 304.

The Supreme Court has declined to draw a bright line between those conditions which transgress accepted bounds of decency and those that pass constitutional muster.  Rhodes, 452 U.S. at 346.  Rather, courts must measure alleged deprivations against an evolving metric, determining on a case by case basis whether challenged conditions offend "contemporary standards of decency." Helling, 509 U.S. at 32, 36; Rhodes, 452 U.S. at 346.

It is undisputed that a prisoner's placement in solitary confinement does not, in itself, violate the Constitution.  See Young v. Quinlan, 960 F.2d 351, 364 (3d Cir. 1992), superseded on other grounds by statute, Prison Litigation Reform Act, 42 U.S.C. § 1997 *et seq.*, as recognized in Nyhuis v. Reno, 204 F.3d 65, 71 n.7 (3d Cir. 2000).  However, the Supreme Court of the United States has admonished that *duration* of confinement "cannot be ignored" in determining whether challenged conditions withstand constitutional scrutiny.  Hutto v. Finney, 437 U.S. 678, 686 (1978); Young, 960 F.2d at 364.  Courts must be cognizant of the "fundamental difference" between deprivation of discretionary privileges that a prisoner in general population may enjoy and deprivation "of the basic necessities of human existence."  Young, 960 F.2d at 364.  A number of courts have resolved that the denials of basic human needs such as social interaction, environmental stimuli, exercise, and sleep which attend long-term isolation run afoul of the Eighth Amendment.  See Shoatz v. Wetzel, No. 2:13-CV-657, 2016 WL 595337 (W.D. Pa. Feb. 12, 2016) (twenty-two years); Ashker v. Brown, No. 09-5796, 2013 WL 1435148 (N.D. Cal. Apr. 9, 2013) (more than twenty years); Wilkerson v. Stalder, 639 F. Supp. 2d 654 (M.D. La. 2007) (twenty-eight and thirty-five years).

Mr. Johnson's entire adult existence has been relegated to a sixty-eight square foot area.  (See Joint Stip. ¶ 12).  Johnson "eats, sleeps, and defecates" in this exiguous space.  (Tr. 1 at 174:22-175:4).  Light illuminates the cell twenty-four hours per day, inexorably leading to bouts of sleep deprivation.  (Doc. 65 ¶ 6; see Doc. 66 ¶ 16).  Johnson exits his cell for three showers per week, and he is allowed only one hour of "yard" time on weekdays, during which time he is confined to a nine-foot by

twenty-foot exercise cage—without exercise equipment.  (Doc. 65 ¶¶ 7, 10; Doc. 66 ¶¶ 19, 23-24).  On weekends and on days of inclement weather, Johnson is confined to his cell for twenty-four continuous hours.  (Doc. 65 ¶ 10).

Johnson's primary view of the world is through three small windows: one in the back of the cell offering a view of the yard, and two narrow, vertical windows in the cell's solid steel door providing a limited view of general population.  (Joint Stip. ¶ 19; Doc. 66 ¶¶ 13, 21).  Johnson can see other inmates but can speak to them only by yelling through the cell door, potentially exposing himself to a misconduct.  (Doc. 65 ¶ 8; see Doc. 66 ¶ 22).  He has no physical contact with visitors.  (Joint Stip. ¶ 18).  Except for incidental contact with corrections officers, Johnson had *no* physical contact with another person from 1979 until he shook the hands of his counsel on the morning of the initial hearing.  (Doc. 65 ¶ 12).  Replicated daily for thirty-six years, individual conditions set forth in the instant Rule 65 record coalesce to comprise an unconstitutional deprivation.  See Wilson, 501 U.S. at 304; see also Shoatz, 2016 WL 595337, at *7-8; Ashker, 2013 WL 1435148, at *4-6; Wilkerson, 639 F. Supp. 2d at 677-78.

In addition, Johnson produces credible evidence that he has suffered—and continues to suffer—psychological deterioration as a direct result of his continued isolation.  The Eighth Amendment protects an inmate's physical *and* mental health. See Farmer, 511 U.S. at 852 (citing Gregg v. Georgia, 428 U.S. 153, 183 (1976)); see also Young, 960 F.2d at 364.  Hence, conditions of confinement which unreasonably jeopardize an inmate's mental health are the proper subject of constitutional scrutiny.  See Farmer, 511 U.S. at 852; Young, 960 F.2d at 364.

Johnson alleges severe psychological deterioration in his complaint.  (See Doc. 1 ¶¶ 42-54).  For purposes of his instant motion, Johnson presents sufficient *probata* to meet his *allegata*.  Johnson testified at length to the palpable, deleterious effects of his prolonged isolation.  He described feeling depressed and anxious, deteriorating short-term memory, and decreasing focus.  (See Doc. 65 ¶ 35).  He also described profound hopelessness, observing that no matter how well he behaves, defendants refuse to release him from isolation.  (Id.)

Dr. Haney's expert report and testimony corroborate Johnson's lay description of his mental degradation.  Dr. Haney opines with certitude that Johnson "has struggled to maintain his sanity" in isolation.  (Tr. 1 at 115:20-25).  He notes that Johnson reported "a variety of different psychological problems" during their interview, including sleeplessness, stress, anxiety, ruminations, obsessive behavior, loss of focus, irritability, anger, and a level of hopelessness that Dr. Haney believes is "deeper than depression," a "kind of despair" that resembles "a sense of grief or a sense of melancholy."  (Id. at 116:12-117:24).  Dr. Haney concludes that Johnson has deteriorated to the point of social death as a direct result of his continued isolation.  (Haney Report ¶¶ 21, 145).  He cautions that, without injunctive relief, Johnson will likely "enter that last or final stage of giving up, or basically not being able to tolerate this existence any longer."  (Doc. 65 ¶ 39).

Defendants make much of the fact that neither PSS Smith nor Dr. Voskanian have diagnosed Johnson with a mental health disorder.  (Doc. 66 ¶ 42).  PSS Smith testified that Johnson has "some bad days . . . [j]ust like anybody else," but she does not believe that he is depressed.  (Tr. 2 at 28:13-14, 54:2-15).  Similarly, Dr.

Voskanian agrees that Johnson reports many symptoms constituent of depressive disorder, but opines that Johnson's symptoms do not arise with sufficient frequency to "elevate to the severity required for the diagnosis."  (Tr. 3 at 76:14-77:17).

Johnson's claim has merit notwithstanding this disagreement as to the clinical extent of his mental deterioration.  The Supreme Court has long held that "the Eighth Amendment protects against *future* harm to inmates" as well as extant and manifest harm.  Helling, 509 U.S. at 33 (emphasis added).  As the Helling Court observed, it would defy the Amendment's spirit to deny injunctive relief "to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."  Id.  Defendants do not, and cannot, dispute this settled proposition.  Even Dr. Voskanian concedes that the "exceptional resilience" thus far demonstrated by Mr. Johnson is not "guaranteed to last forever."  (Doc. 65 ¶ 41).  The court rejects defendants' contention that Mr. Johnson cannot attain relief until his condition devolves below some arbitrary threshold of mental illness.

### 2. *Deliberate Indifference*

Johnson must also demonstrate that defendants acted with deliberate indifference to his mental health in retaining him on the RRL for more than thirty-six years.  See Farmer, 511 U.S. at 834.  This standard is a subjective one, tasking courts to examine whether defendants knew of and disregarded "an excessive risk to inmate health and safety."  Id. at 837.  An inmate in pursuit of constitutional relief need not establish that a "defendant *intentionally* sought to cause the inmate harm."  Chavarriaga, 806 F.3d at 227 (emphasis added).  Rather, an inmate carries

his or her burden by showing that a defendant failed to act despite possessing knowledge that failure to do so "would subject the inmate to a substantial risk of serious harm." Id. When the risk of constitutional harm is "obvious," courts may infer deliberate indifference. Hope v. Pelzer, 536 U.S. 730, 738 (2002).

The record reflects that Secretary Wetzel knows well the risks inherent in prolonged isolation. Secretary Wetzel agreed that "long term" solitary confinement "certainly could" have negative effects on mental health and that Johnson's thirty-six year confinement is "certainly" considered long term. (Tr. 3 at 156:1-7). He also acknowledged that isolation should be used "only . . . in very narrow circumstances when it's absolutely necessary." (Id. at 145:10-13). Moreover, Secretary Wetzel stated that he is familiar with the work of Dr. Haney, which sets forth at length the harmful effects of solitary confinement. (Id. at 156:8-10). The court finds that Secretary Wetzel—the only defendant with authority to remove Johnson from the RRL—knew of the significant mental health risks attending extended isolation.

Both decisional law and academic literature accord with this predicate finding. In a concurring opinion in Davis v. Ayala, 135 S. Ct. 2187 (2015), Justice Kennedy urged courts and prison administrators alike to contemplate critically the "human toll wrought by extended terms of isolation." Id. at 2209. He emphasized the Supreme Court's century-old recognition that "even for prisoners sentenced to death, solitary confinement bears 'a further terror and peculiar mark of infamy.'" Id. (quoting In re Medley, 134 U.S. 160, 170 (1890)). District courts have reached a similar consensus throughout the country. See, e.g., Shoatz, 2016 WL 595337, at *7-8; Ashker, 2013 WL 1435148, at *4-6; Wilkerson, 639 F. Supp. 2d at 677-78. As

one district court has aptly observed:  "[T]hat prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science."  McClary v. Kelly, 4 F. Supp. 2d 195, 208 (W.D.N.Y. Apr. 30, 1986).

Academic literature of both the psychological and penological genre reflect similar findings.  Researchers have observed that "psychological stressors such as isolation can be as clinically distressing as physical torture."  Jeffrey L. Metzner, M.D., et al., *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. AM. ACAD. PSYCHIATRY & LAW 104, 104 (2010).  In calling for an outright ban on solitary confinement beyond fifteen days, a United Nations' Special Rapporteur of the Human Rights Council determined that such confinement may cause "severe mental pain or suffering" and "amount to torture or cruel, inhuman or degrading treatment."  Juan Mendez (Special Rapporteur), *Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/66/268 Summary & ¶¶ 76-78 (Aug. 5, 2011).  Dr. Haney's expert report identifies copious authorities exploring and validating these concerns.  (See Haney Report ¶¶ 30-80).  Defendants concede "there is a strong desire to move away from the long-term segregation and isolation of inmates generally."  (Doc. 33 at 19).

Defendants contend, however, that they possess a legitimate penological rationale for maintaining Johnson in solitary confinement notwithstanding the known risks of extended isolation.  (See id.; Doc. 66 ¶ 106).  The Third Circuit Court of Appeals has recognized that isolation "may be a necessary tool of prison

discipline . . . to control and perhaps protect inmates whose presence within the general population would create unmanageable risks." Young, 960 F.2d at 364 (citing Hutto, 437 U.S. at 685-86).  However, harsh conditions of confinement which lack legitimate penological justification violate the Constitution.  See Hope, 536 U.S. at 737-38; see also Wilkerson, 639 F. Supp. 2d at 680-81.

Defendants classify Johnson as a threat to institutional safety, asserting that "[h]e has not exhibited behavior to demonstrate that he does not intend to escape from the general population."   (Doc. 66 ¶ 106).  Defendants base this concern on: (1) Johnson's involvement in the 1979 escape attempt; (2) his alleged involvement in escape attempts in 1984 and 1987; and (3) his accumulation of "at least ninety class 1 misconducts" during the early years of his incarceration.  (Id. ¶¶ 3-10).

The concerns cited in defendants' briefing are substantially undermined by their own record evidence.  The court does not discount the severity of Johnson's past misconduct.  It is undisputed that Johnson's institutional misconduct record reflects his involvement in three separate escape attempts in an eight-year span. (See Doc. 65 ¶ 70; Doc. 66 ¶¶ 3-10).  However, defendants' argument ignores that Johnson has—in Secretary Wetzel's own words—"stayed out of trouble in prison . . . [for] the last *twenty-five years*."  (Doc. 65 ¶ 71 (emphasis added)).  In the past decade, Johnson received only one minor misconduct, for possessing a multivitamin in his cell.  (Id. ¶ 72).  Secretary Wetzel described this misconduct as "very minor" and observed that he "didn't even consider" it when determining whether to retain Johnson on restricted release status.  (Id.)  Indeed, Deputy Superintendent Meintel,

who interacts regularly with Johnson, described him as "the model inmate." (Id.
¶ 74).

The only cited safety concern with facial plausibility is Johnson's purported
"inability to give the PSS a 'straight answer' concerning his intentions to escape"
during a 2015 psychological review. (Doc. 66 ¶ 92).  PSS Smith observed in her 2015
annual evaluation report that Johnson told her he has "too much respect for" her to
"lie and give [her] the answers . . . they want to hear." (Ex. P-16 at 3).  PSS Smith
noted in the report that Johnson offered this comment while she was asking him
"about his escape attempts and assaults and his plans for doing them in the future."
(Id.)  However, PSS Smith now maintains that she was asking Johnson *only* about
his prospective escape plans, and that she construed his comment as a threat to
escape in the future. (See Doc. 66 ¶ 91; see also Tr. 2 at 39:17-24, 81:3-22).  When
asked why she did not report this perceived threat to security, PSS Smith testified
that she did not consider Johnson to be "an immediate risk," but nonetheless
believed that "he was not ready to be released to general population." (Tr. 2 at
82:19-83:4).  Johnson testified that, *per contra*, his comment was made in the context
of discussing mental health, not his escape record. (See Doc. 65 ¶ 64).  He averred
that, except for his assurances that he "won't try to escape . . . and won't try to hurt
nobody," he never discussed past or prospective escape attempts with his PSS.
(Tr. 3 at 191:6-12).

The court reiterates its prior observation that PSS Smith's report is far from
a model of clarity.  (See id. at 159:6-8).  Notably, the review was conducted *after* PSS
Smith had already voted in support of Johnson's retention on the RRL, and her

report was drafted for the sole purpose of supporting her prior vote.  (Tr. 2 at 80:2-10).  Further, it is unclear from PSS Smith's cursory notations whether Johnson's comment refers to escape propensities at all—and much less to prospective ones.  (See Ex. P-16 at 3).  Inconsistencies between the report and PSS Smith's testimony, together with the patent ambiguities in the report itself, call Secretary Wetzel's exclusive reliance thereon into serious question.  This incertitude is compounded by the Secretary's failure to seek clarification from PSS Smith concerning her vague and incomplete observations.  (See Doc. 65 ¶ 68; Tr. 3 at 159:2-24).

It is hardly a revelation that prisoners sentenced to life in prison without the possibility of parole contemplate, at least momentarily, opportunities to escape.  There is no penal institution in this country where whimsical or even serious thoughts of escape do not cross the minds of inmates…daily.  But to confine an inmate to isolation indefinitely, absent a tenable threat, cannot be justified under the guise of institutional security.  The court preliminarily finds that defendants acted with deliberate indifference in maintaining Johnson on restricted release status *ad infinitum*.

## B.    Irreparable Harm

Irreparable injury is harm of such an irreversible character that prospective judgment would be inadequate to make the moving party whole.  See Anderson v. Davila, 125 F.3d 148, 163 (3d Cir. 1997); Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989).  The mere risk of injury is not sufficient to meet this standard.  Rather, the moving party must establish that the harm is imminent and probable.  Anderson, 125 F.3d at 164.  Harm that may be contained effectively

only through immediate injunctive relief is properly deemed "irreparable." <u>Instant Air Freight</u>, 882 F.2d at 801.

The record establishes that Johnson will continue to suffer irreparable injury in the absence of immediate injunctive relief. As noted at length *supra*, Johnson demonstrates escalating symptoms of mental degradation. This account is well-supported by the report and testimony of Dr. Haney, an expert renowned in the areas of psychology and law. Although defendants' expert ultimately disagreed with Dr. Haney's conclusions, he acknowledged that Johnson reports "problems with concentration, problems with sleep, anxiety, anger, hopelessness, depression, inability to finish tasks, sadness, and stress," and "could also have told me that he hears voices." (Tr. 3 at 74:23-75:3). The court harbors no doubt that Johnson's retention in the RHU will protract his extant injuries and expose him to an imminent and probable risk of even greater psychological damage. Johnson has amply demonstrated a likelihood of irreparable harm.

### C. Public Interest

The public interest generally supports an award of preliminary injunctive relief when a plaintiff has demonstrated both a reasonable likelihood of success on the merits and irreparable harm. <u>AT&T</u>, 42 F.3d at 1427 n.8. This interest is particularly strong where the right to be vindicated derives from the United States Constitution. <u>See</u> <u>Buck v. Stankovic</u>, 485 F. Supp. 2d 576, 586-87 (M.D. Pa. 2007) (quoting <u>G&V Lounge, Inc. v. Mich. Liquor Control Comm'n</u>, 23 F.3d 1071, 1079 (6th Cir. 1994)). Issuance of a preliminary injunction will serve the public's interest in defending the integrity of a constitutional right.

### D.      Balancing of Hardships

To determine whether granting preliminary injunctive relief would result in greater harm to the nonmovant, the court must examine the terms of the proposed injunction, consider the parties' respective positions, and assess the ramifications of the requested relief.  See Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co., 290 F.3d 578, 596-97 (3d Cir. 2002).  Injunctive relief should generally be denied if the potential harm to the nonmovant outweighs the potential benefits to be bestowed upon the movant.  See id. at 596-97.

Defendants rely exclusively on asserted institutional security concerns, arguing that injunctive relief would work greater detriment to the Department than any ostensible benefit to Johnson.  (Doc. 66 ¶ 108).  The court has already concluded that the Department's characterization of Johnson as a threat to institutional security is flawed, as that assessment is based solely on decades-old misconducts and an opaque mental health report.  See supra at 20-23.

The court has no crystal ball.  It may well be that Johnson will endeavor to escape again.  But Mr. Johnson is sixty-four years old.  And he will be subject to three decades of improvements in institutional security over the general population. The Department has at its disposal a broad array of investigative and penological techniques to dissuade even the most entrenched escape artist.  Surely, there are less restrictive means to monitor Mr. Johnson than solitary confinement.  For all of these reasons, the court finds that defendants fail to demonstrate a prospective harm to the Department outweighing Johnson's interest in vindicating his constitutional rights.

## V.    Conclusion

When he entered Department custody in August 1973, Mr. Johnson was twenty-one years old, and his life expectancy was forty-four more years.  See U.S. DEP'T OF HEALTH, EDUCATION, AND WELFARE, LIFE TABLES (1973).  He has now served over eighty percent of that life expectancy in solitary confinement.  The government's proffered reason for Mr. Johnson's continued exile—that he is an "escape risk"—is unpersuasive and substantially outweighed by the compelling facts presented in support of preliminary injunctive relief.  Indeed, it is difficult to conjure up a more compelling case for reintegration to the general prison population.  After thirty-six years of isolation, Mr. Johnson deserves the opportunity to shake hands with someone other than his attorneys.

The court will grant Johnson's motion (Doc. 3) for preliminary injunction and direct his release from the RHU forthwith, in accordance with the accompanying order.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        September 20, 2016